**UNITED STATES of America, Appellee,**

**v.**

**James JENKINS, Derrick Luther, a/k/a Derrick Hall, Defendants– Appellants.**

**Docket Nos. 05–2679–cr(L), 05–5307–cr(CON).**

United States Court of Appeals, Second Circuit.

Argued: June 15, 2006.

Decided: June 23, 2006.

Colleen P. Cassidy, Federal Defenders of New York, Inc. Appeals Bureau, New York, NY, for Defendant–Appellant James Jenkins.

Richard E. Signorelli, New York, NY, for Defendant–Appellant Derrick Luther.

John J. O'Donnell, Assistant United States Attorney (Michael J. Garcia, United States Attorney, and John M. Hillebrecht, Assistant United States Attorney, on the brief), United States Attorney's Office for the Southern District of New York, New York, NY, for Appellee.

Before MESKILL, CABRANES, and WESLEY, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge.

We consider here whether officers who reasonably believe that they have valid grounds for pulling over a vehicle, but then realize once the vehicle is stopped that they acted on the basis of a mistake of fact, violate the Fourth Amendment rights of the occupants of the vehicle simply by walking up to the vehicle. We conclude that in such circumstances the officers do not violate the Fourth Amendment rights of the occupants because it is reasonable for the officers to approach the vehicle to explain the situation and to inform the occupants that they are free to go. If, immediately upon coming near the vehicle, the officers learn new facts that give rise to a reasonable belief that the occupants are engaged in criminal activity, the officers may continue the detention to investigate further.

## BACKGROUND

The facts set forth below are taken from the opinion of the United States District Court for the Southern District of New York (Denny Chin, *Judge*) and are undisputed unless otherwise indicated.

At around 11:30 p.m. on January 18, 2004, Sergeant Robert Patelli and Police Officers Brendan Owens and Sean Lynch

of the New York City Police Department (the "officers") were patrolling in an unmarked car, heading north on Valentine Avenue near 182nd Street in the Bronx. According to the testimony of Officer Owens, he saw a sport utility vehicle ("SUV") proceeding south on Valentine Avenue that had no front license plate and had what might have been illegally tinted windows. As the SUV passed and Owens watched in his side mirror, he believed he saw that the SUV lacked a rear license plate. Officer Lynch testified that he had also watched the SUV pass and noticed that it had darkly tinted windows and seemed to have no rear license plate. Deciding to pull the SUV over, *see* N.Y. Veh. & Traf. Law ("VTL") §§ 375(12–a)(b) (setting forth limits on the tinting of vehicle windows),[1] 402(1)(a) (requiring a vehicle to have license plates "conspicuously displayed, one on the front and one on the rear," unless only one plate is issued, in which case the plate "shall be displayed on the rear of the vehicle"), Owens, who was driving the police car, made a U-turn, illuminated his car's flashing red light and stopped the SUV at the corner of Valentine Avenue and 182nd Street.

After the stop, the officers exited their vehicle and approached the SUV. While walking up to the SUV, Officer Lynch apparently noticed a temporary plate on the rear of the SUV, but did not focus on it because he was concentrating his attention on the occupants of the SUV. Indeed, a temporary Delaware plate that was "extremely difficult to read," *United States v. Jenkins*, 324 F.Supp.2d 504, 506 (S.D.N.Y. 2004), was actually affixed to the rear of the SUV.[2] Officer Owens testified that he did not notice the temporary plate on the rear of the vehicle and did not become aware of it until after defendants had been arrested and the SUV brought to the police station.

As Officer Owens went to speak to the driver of the SUV, Officer Lynch followed behind and Sergeant Patelli moved to the passenger side of the SUV. Officers Owens and Lynch smelled the odor of marijuana. Owens began to talk to Keith Hazel, the driver of the SUV, and asked who was smoking marijuana. Hazel replied that he did not smoke marijuana, and, in response to a request from Officer Owens, informed the officers that he did not have a driver's

---

1. Specifically, VTL § 375(12–a)(b) provides that

    [n]o person shall operate any motor vehicle upon any public highway, road or street: (1) the front windshield of which is composed of, covered by or treated with any material which has a light transmittance of less than seventy percent unless such materials are limited to the uppermost six inches of the windshield; or (2) the sidewings or side windows of which on either side forward of or adjacent to the operator's seat are composed of, covered by or treated with any material which has a light transmittance of less than seventy percent; or (3) if it is classified as a station wagon, sedan, hardtop, coupe, hatchback or convertible and any rear side window has a light transmittance of less than seventy percent; or

    (4) the rear window of which is composed of, covered by or treated with any material which has a light transmittance of less than seventy percent. A rear window may have a light transmittance of less than seventy percent if the vehicle is equipped with side mirrors on both sides of the vehicle so adjusted that the driver thereof shall have a clear and full view of the road and condition of traffic behind such vehicle.

2. There was no license plate on the front of the SUV. The District Court determined, however—and the parties do not dispute—that "[h]ere, as the SUV was registered in Delaware, only a rear plate was required in Delaware, and the dealer in Delaware issued Hall (the owner of the SUV) only one temporary plate, the SUV was not required to have a front plate." *Jenkins*, 324 F.Supp.2d at 507.

license. Derrick Luther, who was sitting in the rear seat behind Hazel, rolled down his window and told Owens that he (Luther) had a driver's license. Officer Lynch told Luther to keep his hands visible because it seemed that Luther was hiding something in his hand. All the occupants were then directed to exit the SUV.

Sergeant Patelli found a firearm in the area of the front passenger seat, gave a signal, and all the male occupants of the SUV were handcuffed.[3] Hazel became agitated and asked the other occupants what they had in the car that had precipitated the handcuffing. Luther responded that he had a gun. The officers had, however, recovered the firearm from the front passenger seat of the SUV, where James Jenkins—and not Luther—had been seated. Sergeant Patelli then looked in the area of the rear passenger seat where Luther had been seated and found a second firearm.

The occupants of the SUV—Jenkins, Luther, Hazel, and the owner of the SUV, Rodney Hall—were placed under arrest and taken to the station house. After being read warnings pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Jenkins and Luther each voluntarily waived his rights and made a written statement admitting ownership of one of the recovered firearms. Hazel, who was given a summons for driving without a license and without the required insurance, was released. Hall was released without being charged.

The officers did not measure the tint of the windows on the SUV to determine if it was too dark to comply with VTL

§ 375(12–a)(b), *see* note 1 *ante,* nor did the officers issue any summons for violation of that provision.

On February 24, 2004, Jenkins and Luther were indicted, each on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g).[4] In April 2004, Jenkins and Luther each filed a motion seeking to suppress the physical evidence seized from him and the statement he made following his arrest. On June 15, 2004, Judge Chin held an evidentiary hearing on the motions of Jenkins and Luther. At the hearing, the Government introduced the testimony of Officers Owens and Lynch, as well as physical evidence. Defendants introduced the testimony of Rodney Hall, as well as photographs of the SUV taken shortly after the incident. Judge Chin viewed the SUV outdoors in the light and the shade and then viewed it inside the parking garage underneath the courthouse.

The District Court denied defendants' motions in a Memorandum Decision dated July 8, 2004. The Court decided that the tinting on the windows of the SUV was lawful and that there was actually a temporary Delaware plate affixed to the rear of the SUV.[5] The Court therefore concluded that "the traffic violations that the officers testified they thought they saw did not actually exist." *Jenkins,* 324 F.Supp.2d at 507.

The Court rejected the Government's reliance on the police officers' mistake of fact regarding the tinting of the windows because "[a]lthough the angle of the front

---

3. In addition to the four males—Luther, Hazel, James Jenkins, and Rodney Hall—there was a female occupant of the SUV who was not handcuffed or arrested.

4. 18 U.S.C. § 922(g)(1) makes it unlawful for a person "who has been convicted in any court of[ ] a crime punishable by imprison-

ment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition."

5. The Government does not dispute that the tinting was lawful and that the SUV did in fact have a lawful temporary Delaware license plate.

windshield and the resulting glare could make the windshield appear to look tinted, the same could be said of virtually any vehicle, particularly at night." *Id.* at 510. The Court explained further that "although the center and rear side windows and rear windshield were so darkly tinted that it was difficult to see inside, this tinting was legal, and to the extent the officers believed otherwise, their mistake was one of law, not fact." *Id.* Accordingly, the Court refused to accept the window-tinting rationale for the traffic stop.

With respect to the officers' mistaken belief that the SUV did not have license plates, the Court determined that because the temporary license plate that had actually been affixed to the rear of the vehicle was hard to see and poorly illuminated, "an objective police officer would have had a reasonable basis to believe there was a traffic violation and to stop the SUV." *Id.* The Court explicitly "accept[ed] the officers' testimony to the extent that they testified that they did not observe a rear plate when they first saw the SUV." *Id.*

The Court found unpersuasive defendants' argument that, once the officers pulled behind the SUV and stopped it, they should have noticed the temporary plate and waved the SUV on without further detaining the occupants. The Court explained that "[e]ven assuming that an objective police officer would have seen the temporary plate on the SUV as he approached on foot after the SUV had been pulled over, and even assuming that the basis for stopping the SUV dissipated as a consequence, it would have been reasonable for an objective police officer to speak to the driver to tell him he was free to go." *Id.* at 511. The Court further determined that if "once the objective police officer approached the SUV to tell the driver he was free to go, the officer would have detected the odor of marijuana," that

"would have given the police officer probable cause to further detain the SUV and question the driver." *Id.* The Court therefore denied the motion to suppress the seized firearms and the statements that defendants made after being arrested.

Following the denial of the suppression motions, the Court conducted separate bench trials on stipulated facts, and Jenkins and Luther were each found guilty. On October 20, 2004, Luther was sentenced principally to twenty-seven months of imprisonment. Luther filed a notice of appeal from his conviction and sentence, and with the Government's consent, the cause was remanded to the District Court pursuant to *United States v. Crosby*, 397 F.3d 103 (2d Cir.2005). On remand, Luther was sentenced principally to time served after having spent approximately sixteen months in prison.

On October 20, 2004, Jenkins was sentenced principally to seventy months of imprisonment. Jenkins appealed his conviction and sentence, and the cause was remanded to the District Court, on consent of the Government, pursuant to *United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005). On May 17, 2005, Jenkins was resentenced principally to fifty-two months of imprisonment.

On appeal, defendants argue that the evidence supporting their convictions was obtained in violation of the Fourth Amendment. Specifically, they contend that the SUV in which they were traveling was unlawfully stopped and that, in the alternative, if the initial stop was lawful, the permissible justification for the stop dissipated once the officers pulled the SUV over and saw the valid temporary plate.

## DISCUSSION

We review the District Court's findings of fact for clear error and its application of

law *de novo*. *See United States v. Thompson*, 35 F.3d 100, 103 (2d Cir.1994).

■ The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

The stop of a vehicle must be "reasonable" in the circumstances presented, *id.* at 810, 116 S.Ct. 1769, and an officer making a stop must have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). In other words, an officer may not lawfully "order someone to stop unless the officer reasonably suspects the person of being engaged in illegal activity." *United States v. Swindle*, 407 F.3d 562, 567 (2d Cir.2005).

■ We find no error in the District Court's determination that the initial basis for the stop of the SUV was valid because the officers reasonably believed that the SUV lacked license plates, which would have been a violation of VTL § 402(1)(a). *See Whren*, 517 U.S. at 810, 116 S.Ct. 1769 ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

The constitutional validity of a stop is not undermined simply because the officers who made the stop were mistaken about relevant facts. *See Saucier v. Katz*, 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution."); *Illinois v. Rodriguez*, 497 U.S. 177, 185–86, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) ("It is apparent that in order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government—whether the magistrate issuing a warrant, the police officer executing a warrant, or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement—is not that they always be correct, but that they always be reasonable."). In this case, because the officers had a reasonable but mistaken belief that the SUV lacked license plates, stopping the vehicle was "justified at its inception." [6]

---

**6.** Jenkins argues that the District Court failed to determine whether the officers saw the temporary Delaware plate after they made the U-turn and pulled behind the SUV, but before the SUV was stopped. Had the officers seen the plate prior to actually stopping the SUV, Jenkins's argument continues, the stop would not have been justified. Thus, according to Jenkins, the cause should be remanded to the District Court for a finding as to whether the plate was visible prior to the stop being effected.

The District Court credited the officers' testimony that the temporary plate was difficult to read and made an independent finding that the plate was "virtually impossible to read" in photographs that were introduced into evidence and that had been "taken in broad daylight from just a few yards away." *Jenkins*, 324 F.Supp.2d at 506 n. 3. The District Court also explained that "[o]nly '[s]econds' elapsed from the moment [the officers] first noticed the SUV until [they] stopped it." *Id.*

*Terry,* 392 U.S. at 20, 88 S.Ct. 1868; *cf. Swindle,* 407 F.3d at 568 ("[A]n illegal stop cannot be made legal by incriminating behavior that comes after the suspect is stopped.").

The District Court did not make specific findings concerning which, if any, of the officers saw the license plate once the vehicle was pulled over, but because Officer Lynch acknowledged seeing the temporary plate as he approached the vehicle, we assume, for the purposes of this analysis, that, shortly after the SUV was stopped, the police became aware that there had in fact been no traffic violation.[7]

■ According to Jenkins, the Fourth Amendment rights of the SUV's occupants were violated once the officers noticed the plate because the officers should not have approached the SUV, but rather, should have "[waved] the SUV on and gotten back in their car." Jenkins's Br. at 23. We disagree. We hold that when police officers stop a vehicle on a reasonable, albeit erroneous, basis and then realize their mistake, they do not violate the Fourth Amendment merely by approaching the vehicle and apprising the vehicle's occupants of the situation.

Both the Government and defendants rely on *United States v. McSwain,* 29 F.3d 558 (10th Cir.1994), a case in which a trooper stopped a vehicle in the mistaken belief that the vehicle may have had an expired registration sticker. After making the stop, the trooper became aware that the vehicle was validly registered, but he nonetheless proceeded with his routine practice of requesting the driver's license and the registration of the vehicle and running a criminal record check on the driver. *Id.* at 560. The Court of Appeals for the Tenth Circuit held that the trooper violated the defendant's Fourth Amendment rights because the "reasonable suspicion regarding the validity of [the defendant's] temporary registration sticker was completely dispelled *prior* to the time he questioned [the defendant] and requested documentation." *Id.* at 561. The Court made clear, however, that its holding did not require "absurd conduct by police officers." It therefore suggested in dictum that "[a]s a matter of courtesy," the trooper would have been able to explain "the reason for the initial detention." *Id.* at 562. It would thus have been reasonable for the trooper to converse briefly with the motorist to inform him of what had happened. *Id.*

at 506 (second alteration in original). These findings indicate that the District Court considered, and rejected, the contention that the officers had the opportunity to observe the temporary Delaware plate prior to the stop of the SUV.

7. Officer Owens and Officer Lynch each testified that as he approached the SUV on foot after the stop, his focus was on the occupants. Nevertheless, Officer Lynch happened to see the temporary plate. Accordingly, we assume, for purposes of deciding this case, that the officers' initial reasonable suspicion was dissipated by the time they began to speak to the driver of the vehicle. Nothing in our discussion should be understood, however, to suggest that the officers had an obligation,

upon exiting the police car and approaching the SUV, to take affirmative steps to confirm the initial basis of their reasonable suspicion. At such moments, it is entirely reasonable—and indeed desirable—that officers be primarily focused on ensuring their own safety. *See Pennsylvania v. Mimms,* 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) ("[W]e have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile." (citing *Adams v. Williams,* 407 U.S. 143, 148 n. 3, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972))); *see also Terry,* 392 U.S. at 23, 88 S.Ct. 1868 ("Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.").

We agree with the Tenth Circuit. "The touchstone of the Fourth Amendment is reasonableness," *United States v. Knights,* 534 U.S. 112, 118, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), and it is reasonable for officers who have stopped a vehicle on the basis of a reasonable factual mistake to approach the vehicle and apprise the vehicle's occupants of the situation. Accordingly, we conclude that, in the circumstances presented here, the officers did not offend the Fourth Amendment merely by approaching the SUV because it would have been reasonable for them to inform the SUV's occupants of what had happened.[8]

As the officers approached the SUV, they immediately detected an independent basis for continuing to detain the SUV and its occupants. *See United States v. Edgerton,* 438 F.3d 1043, 1051 (10th Cir.2006) ("[T]he brief encounter between an officer and driver authorized by *McSwain* might independently give rise to facts creating reasonable suspicion of criminal activity, thus warranting further investigation."). Officer Owens testified that "[w]hen I went to speak to Mr. Hazel, I noticed an odor emanating from the vehicle at that point." Tr. of Suppression Hr'g, June 15, 2004, at 18.[9] The District Court implicitly credited Owens's testimony by finding that the smell would have been evident "once the objective police officer approached the SUV to tell the driver he was free to go."[10] *Jenkins,* 324 F.Supp.2d at 511. The officers then had "a particularized and objective basis for suspecting legal wrongdoing," *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (internal quotation marks omitted), and were justified in continuing the detention of the SUV and its occupants.

Because the officers did not act unreasonably in approaching the vehicle, and because an independent basis for investigation was immediately apparent, the officers did not violate the Fourth Amendment rights of the occupants by questioning them.

---

8. The District Court made no specific finding concerning the purpose of the officers in approaching the vehicle. No such finding was necessary, however, because the officers had only taken the objectively reasonable action of walking up to the SUV before detecting the odor of marijuana. *See Whren,* 517 U.S. at 813, 116 S.Ct. 1769 (noting that the Supreme Court's "cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"); *United States v. Dhinsa,* 171 F.3d 721, 725 (2d Cir.1998) ("*Whren* and other Fourth Amendment cases require that we judge the reasonableness of an officer's actions based on the objective circumstances surrounding her actions and not on her subjective intent.").

9. Officer Lynch also testified about the smell of marijuana coming from the vehicle, but he did not specifically indicate whether the smell was detectable immediately as he approached the vehicle.

10. We disagree with Jenkins's contention that our reading of the Fourth Amendment will lead to "rampant abuse" by allowing the police to "claim not to notice a license plate that complies with the law, detain motorists for nonexistent motor vehicle violations, and then approach the driver to say 'sorry' while taking a sniff and a look inside." Jenkins's Br. at 23. Our holding here is limited by two key factors. First, the District Court reviewed and deemed credible the officers' testimony regarding their reasonable but mistaken belief that the SUV lacked license plates. *Cf. United States v. Wilson,* 205 F.3d 720, 723–24 (4th Cir.2000) (en banc) (holding that the Fourth Amendment prohibits an officer from stopping a vehicle that has a visible temporary license plate "solely because [the officer cannot] read the handwritten expiration date [on the plate]"). Second, the District Court found that the odor of marijuana was immediately apparent as the officers approached the SUV. The officers had not detained the SUV for longer than necessary to briefly explain to the occupants the reason for the stop.

As a result, the firearms that were recovered and the statements that defendants made were not excludable as "fruit of the poisonous tree." *See Segura v. United States*, 468 U.S. 796, 804–05, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984); *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).[11]

## CONCLUSION

We have considered all of defendants' arguments and find them to be without merit. The District Court properly denied the motions to suppress evidence, and the judgment of conviction entered against each defendant is therefore AFFIRMED.

11. Defendants do not assert any basis for suppressing the evidence apart from the "taint" supposedly caused by the allegedly improper stop.